IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Brian Reid,                          :
                                     :
            Plaintiff,               :
                                     :
      v.                             :        CIVIL ACTION NO.
                                     :        1:08-cv-01846-JOF
The City of Atlanta, et al.,         :
                                     :
            Defendants.              :
                                     :

## OPINION & ORDER

This matter is before the court on Defendants' motion for leave to file excess pages [44], Defendants' motion for summary judgment [45], Defendants' motion for summary judgment [47],[1] Plaintiff's motion for summary judgment [57], Plaintiff's motion for leave to file excess pages [62], and former Defendant Cynthia Myers' motion for judgment [67].

Plaintiff filed suit against the City of Atlanta, Richard Pennington, Alan J. Dreher, Harold R. Dunovant, Lane A. Hagin, and Cynthia Myers on April 24, 2008 in the Superior

---

[1] The court notes that Docket Entry [45] is Defendants' brief and attachments supporting its motion for summary judgment, while Docket Entry [47] is Defendants' actual motion. Both are docketed as pending motions. The court will consider and address these as though they were one docket entry. The court also notes that Docket Entry [64] is mislabeled as being Defendants' response to Plaintiff's statement of material facts for **Plaintiff's** summary judgment motion. Instead, Docket Entry [64] is Defendants' response to Docket Entry [63], the statement of material fact that Plaintiff provided with his reply to **Defendants'** motion for summary judgment.

Court of Fulton County. The case was removed to this court on May 23, 2008. In his complaint, Plaintiff alleges against all Defendants violations of his First Amendment right to free speech pursuant to 42 U.S.C. § 1983 and conspiracy in violation of 42 U.S.C. § 1985. He also alleged tortious interference in employment against former Defendant Myers. Myers (and the United States of America who stepped in on her behalf) was dismissed from this case pursuant to an order by this court on February 25, 2009. Therefore, the only counts remaining are those for violations of Plaintiff's First Amendment rights pursuant to § 1983, and his claims that the remaining Defendants illegally conspired against him in violation of § 1985.

## I. Motions for Summary Judgment and Motions for Leave to File Excess Pages

The parties have filed cross-motions for summary judgment. Plaintiff requests summary judgment on all of his remaining claims, with damages to be determined at trial. Defendants also request summary judgment on Plaintiff's remaining claims. Defendants filed their motion for summary judgment on May 11, 2009. With their motion, Defendants filed a statement of material fact as required by this court's local rules. The Defendants' statement of material fact contains only thirteen statements of fact, while Defendants' brief references a multitude of other facts. The court noted in an order issued on May 19, 2009, that pursuant to Local Rule 56.1(B), the court would "not consider any fact set out in Defendants' brief in support of its Motion for Summary Judgment [45-1] that is not also set

2

out in Defendants' Statement of Undisputed Facts [48]." Docket Entry [60], at 2. The court also suggested that Defendants might wish to supplement their original statement of fact, but Defendants chose not to do so.

While the court realizes what its previous order stated, the court finds it impractical and unnecessary to set out different sets of facts, for the same situation, when the parties have filed cross-motions for summary judgment on the same counts, discussing the same issues, and the same nuances of law. It benefits neither the court nor the parties. Defendants' failure to supplement its statement of material fact may not have been the best decision on Defendants' part, but it does not change the fact that certain facts are just that - facts. To make a decision regarding each motion for summary judgment, the court will rely on those facts in Plaintiff's motion for summary judgment that are undisputed and supported by the record and Plaintiff's attached material statement of fact, those facts in Defendant's motion for summary judgment that are undisputed and supported by the record and Defendants' attached material statement of fact, as well as the evidence the parties have placed on the record.[2] The Local Rules are intended to benefit the court, but here, when applied literally, would simply hinder the court's decision-making process. The law favors decisions on the merits of the case, not "mere technicalities." *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986).

---

[2] Plaintiff and Defendants cite the deposition of Brian Reid, but there is no record that this deposition was ever filed with the court. The court cannot consider facts that are unsupported by the record.

AO 72A
(Rev.8/82)

Also in conjunction with their motion for summary judgment, Defendants filed a motion to exceed the page limit allowed by this court's Local Rule 7.1(D) for their supporting brief. Docket Entry [44]. Plaintiff, in response, also filed a motion to exceed the page limit allowed to him by L.R. 7.1(D) for his response brief to Defendants' motion for summary judgment. Docket Entry [62]. Both motions are GRANTED [44] and [62].

## A.    Factual Background and Contentions

Plaintiff is a police officer, certified by the Police Officer Standards and Training Council, and employed by the City of Atlanta Police Department (APD). Docket Entry [61-2], at ¶1. Defendant Pennington was the Chief of Police of the APD at all times relevant to this lawsuit. Docket Entry [61-2], at ¶2. Defendant Dreher was, at all times relevant to this lawsuit, the Assistant Chief of Police for the APD. Docket Entry [61-2], at ¶3. Defendant Dunovant was Deputy Chief of Police for the APD at all times relevant to this case but is now retired. Docket Entry [61-2], at ¶4. Defendant Hagin was, at all time relevant to this lawsuit, the Major serving as Commander of the Field Operations Division for Zone 5. Docket Entry [61-2], at ¶5.

On July 27, 2006, Plaintiff testified as a character witness on behalf of Michael Grissom at a bond hearing in a United States Magistrate Court. Docket Entry [61-2], at ¶6. Although the record is a bit confusing, Grissom appears to be Plaintiff's longtime girlfriend's sister's husband, whom Plaintiff had known for at least eight years at the time

4

of Grissom's hearing. Detention Hearing Transcript, *USA v. Grissom*, Criminal Action No. 1:06-CR-347-CC-GCB, at 2. Plaintiff contends that he was at the hearing to support his girlfriend, and he was not asked to testify on Grissom's behalf until right before the hearing. At Grissom's hearing, Reid testified on direct examination that he was a police officer and had been one for nine years. Detention Hearing Transcript, at 2. He also testified that he knew Grissom "[e]ssentially as a family member." *Id*. On cross-examination, Plaintiff was asked what jurisdiction he worked for, to which he replied "the City of Atlanta." *Id*. at 4. He testified that he had worked for the City of Atlanta for nine years, and that at the time of the detention hearing, he was a Senior Patrol Officer. *Id*. at 5. While on the stand, Plaintiff further testified that he was presently off duty. *Id*.

Although it is unclear to the court exactly when, at some point in the day or two following his testimony, Plaintiff contacted Sergeant Gordon Earls to inform him that he testified on behalf of Grissom. Docket Entry [61-2], at ¶ 14. According to Defendants, Plaintiff wanted to know whether he would get in trouble for testifying for Grissom, to which Earls responded that he needed to notify someone in his chain of command. *Id*. Plaintiff states simply that he "sought counsel from a supervisor in the City of Atlanta Police Department's Internal Affairs unit, Sgt. Earls, to determine if any work rules governed his testimony." *Id*. Sergeant Earls, as a member of the Internal Affairs unit, is not in Plaintiff's direct chain of command, but he is still ranked above Plaintiff.

5

Former Defendant Myers was the FBI agent in charge of prosecuting Grissom. After the detention hearing, she contacted the City of Atlanta Police Department and spoke to Lieutenant Hendricks, who worked with the Office of Professional Standards—a department that either encompasses or is the same as the Internal Affairs unit. Hendricks Depo., at 18:12-19:5; Pennington Depo., at 12. Defendants interpreted Agent Myers' phone call as a complaint about the fact that Officer Reid testified on behalf of a criminal defendant. Docket Entry [61-2], at ¶17. Hendricks claims that he told Agent Myers to write up any grievance she might have and send it to him. Hendricks Depo., at 22:23-25. Agent Myers did send a memo to Hendricks outlining exactly what Plaintiff testified to at Grissom's hearing. Dunovant Depo., Ex. 1, at P-5-1-2. The document Agent Myers sent to the Atlanta Police Department did not state that Agent Myers had a problem with Plaintiff testifying. *Id*. It merely stated that Plaintiff testified on Grissom's behalf, what Grissom had been charged with, and the nature and content of Plaintiff's testimony. *Id.*

After Agent Myers' memo to the Atlanta Police Department, an internal investigation into Plaintiff's actions was started at the end of July 2006. Dunovant Depo., Ex. 1. Plaintiff gave an employee statement on August 22, 2006, in which he stated, in part, that he had no plans to testify prior to attending Grissom's hearing and that he did not notify his supervisor prior to testifying. *Id*. at P-6-1-6–P-6-2-6. An investigative summary was given to Lieutenant Hendricks on August 25, 2006 by Investigator D. E. Haff with the Internal

6

Affairs Unit. *Id*. at P-4-1-3. That investigative summary listed the complaint as being under APD Work Rule 4.1.12, which states, "Employees will not engage in any transaction with any complainant, suspect, defendant, prisoner, or other person involved in a department matter whereby the successful prosecution of that matter or an employee's personal integrity may be jeopardized." Docket Entry [45], at 17 n. 4. The investigative report stated that the findings of the investigation were as follows:

> Officer Reid did in fact give direct testimony in the United States Northern District of Georgia Court on behalf of Michael Grissom, who was charged with two (2) counts of Bank Robbery and one (1) count of Possession of a Firearm During the Commission of a Felony. Officer Reid admits that he provided testimony but said he was not subpoenaed by the defense and had no intention to testify when he went to Court. Michael Grissom is Officer Reid's brother-in-law, and the only reason Officer Reid had gone to Court was to support his sister-in-law and her children.

Dunovant Depo., Ex. 1, at P-4-2-3. Lieutenant Hendricks sent a memo to Major Harris on August 27, 2006, which expressed that after a review of the case, the Complaint against Plaintiff under 4.1.12 was sustained. Dunovant Depo., Ex. 1.

As far as the court can tell, the following is the process that happened once the investigative report was received by Internal Affairs. Plaintiff's Disciplinary Complaint Folder was sent to each supervisor in Plaintiff's chain of command: Lt. Hedley, Major Hagin, Deputy Chief Dunovant, Assistant Chief Dreher, and Chief Pennington. The folder was sent to Lt. Hedley first. According to Defendants, the Disciplinary Complaint Folder at the time contained: (1) The memo from former Defendant Myers that was sent to Lt.

7

Hendricks, (2) the preliminary complaint citing rule 4.1.12 as the rule upon which the complaint was based, (3) Investigator Haff's Memo to Plaintiff stating that Plaintiff was being investigated and needed to make an appointment with the Office of Professional Standards, (4) a transcript of Plaintiff's interview with Investigator Haff (the employee statement referred to above), and (5) an Employee Discipline Worksheet. The Employee Discipline Worksheet form contained Plaintiff's most recent disciplinary history and referenced rule 4.1.12 as the rule violated. Dunovant Depo., Ex. 1. It seems that the Unit Commander, Assistant Section Commander, Section Commander, and Division Commander in the employee's chain of command, the men listed above, had to then review the file and determine whether they concurred with the discipline recommended by the person lower on the command chain than them. *Id*. If they did not concur, they were required to fill out a separate worksheet. *Id*. If they did concur, they acknowledged their concurrence on the employee's Employee Discipline Worksheet. *Id*.

Lt. Hedley, being the lowest in Plaintiff's command chain, and therefore, the first reviewer, recommended only that Plaintiff be demoted based upon the sustained violation of Work Rule 4.1.12. Dunovant Depo., Ex. 1, at P-8-1-2. Major Hagin did not concur with Lt. Hedley's recommendation and filled out a new worksheet, which recommended that Plaintiff be demoted <u>and</u> receive a 10-day suspension. *Id*. at P-1-1. Deputy Chief Dunovant did not concur with Major Hagin's recommendation and filled out a new worksheet, which

8

recommended that Plaintiff be demoted and receive a 30-day suspension. *Id*. Assistant Chief Dreher concurred with Deputy Chief Dunovant's recommendation. *Id*. at P-1-1-1. Chief Pennington, the final reviewer, concurred on November 14, 2006 with the recommendation that Plaintiff be demoted and suspended for 30 days due to a sustained violation of Rule 4.1.12. *Id*. According to Defendants, Chief Pennington has the sole authority to demote and suspend a police officer, and recommendations from other officers are "advisory only." Docket Entry [61-2], at ¶ 41.

On January 22, 2007, a new Employee Discipline Worksheet was created and put in Plaintiff's file. Dunovant Depo., Ex. 1. The recommended discipline was the same, but the rule under which the punishment was being given had changed from 4.1.12 to 4.3.03.[3] *Id*. Work Rule 4.3.03 states, "Employees who have been arrested or become involved in any court action, in any capacity other than as a witness for the prosecution, will immediately notify the Chief of Police in writing through the chain of command." *Id*. at P-10-2-4. The new Employee Discipline Worksheet was created by Sergeant Brady and recommends only suspension for 30 days. *Id*. No new investigative report appears in the file, and there is no

---

[3] There is a Memo to File that refers to Rule 4.3.03. However, the court is concerned with the credibility of that document. The Memo to File is amidst documents (both physically and in reference to the page number at the bottom) that refer to Rule 4.1.12, and everything else in the file, up until early 2007, refers to Rule 4.1.12. Furthermore, Chief Pennington testified that Rule 4.3.03 was not the rule at issue until early 2007. *See* Pennington Depo., at 49:5-15; 90-92.

memo sustaining allegations that Plaintiff violated Rule 4.3.03.[4] After the Chief decides what punishment is appropriate, a notice is issued to the employee being investigated. Pennington Depo., at 34. According to Chief Pennington, this notice is usually issued within one to two weeks after the Chief's review. *Id*. at 34-35. Even though Chief Pennington concurred with the punishment regarding the original charge of a violation of Rule 4.1.12 in November, no notice was issued at this point. Instead, a "Notice of Proposed Adverse Action" (NPAA) was eventually created on February 14, 2007, and it stated that the proposed action was a 30-day suspension for violation of Rule 4.3.03. *Id*. at P-10-1-4.

The NPAA was issued to Plaintiff, and it gave him the option of responding in writing or appearing before Chief Pennington on February 19, 2007. *Id*. The NPAA also gave the text of Rule 4.3.03, and then stated:

> **SPECIFICALLY**: On July 27, 2006, you appeared as a witness for the defense at a bond hearing for defendant Michael Grisson [sic]. U. S. Magistrate E. Clayton Scofield, Northern District of Georgia, presided over the detention and bond hearing.
>
> Michael Grisson [sic] had been charged with two counts of Bank Robbery and one count of Use of a Firearm during the Commission of a Felony, and he has two prior armed robbery convictions. You, by your admissions, said you provided character testimony regarding Mr. Grissom's background and your relationship with him.
>
> Furthermore, you stated you knew Mr. Grisson [sic] had been criminally charged with Bank Robbery, and you had known him for nine (9) years.

---

[4] Compare to Dunovant Depo., Exhibit 1, at memo from Lt. Hendricks to Major Harris, which sustained a violation of Rule 4.1.12.

**YOUR ACTIONS AS DESCRIBED ABOVE ARE IN VIOLATION OF THE LISTED RULE(S).**

*Id*. at P-10-2-4. Rule 4.1.12 was not mentioned at all in the NPAA, but neither were any facts regarding whether Plaintiff notified anyone in his chain of command about his testimony. *Id*. On February 14, 2007, Assistant Chief Dreher sent a memo to Chief Pennington stating that he thought a 30-day suspension and reassignment to Patrol Officer was appropriate for the violation of work rule 4.3.03. Dunovant Depo., Ex. 1. Defendants argue that Chief Pennington and Assistant Chief Dreher conducted a *de novo* review of Reid's disciplinary complaint in February 2007, after the work rule upon which the proposed discipline was based changed from 4.1.12 to 4.3.03, and therefore, reviews by the others in Plaintiff's chain of command were not necessary and did not occur.[5]

After the NPAA was issued, Plaintiff appeared in front of the Chief for a hearing. On the same day as the hearing, February 19, 2007, a Notice of Final Adverse Action (NFAA) was issued. *Id*. at P-10-3-4. In the NFAA, it is noted that at the hearing, Plaintiff disagreed with the recommended discipline. *Id*. at P-10-3-4. Under section entitled "Final Adverse Action," only the line reading "Suspension without pay for 30 working days" was checked.

---

[5] In Dreher's February 2007 memo to Pennington, he states that he concurs with the recommendation of Chief Dunovant to suspend and demote Plaintiff. Dunovant Depo., Ex. 1. However, the court notes that from reviewing Plaintiff's Disciplinary Action file, it appears that the only time Chief Dunovant made a recommendation was in November of 2006, which is when Plaintiff was charged with violating Rule 4.1.12.

*Id*. The line for demotion was not checked. *Id*. In the box asking for a narrative of the disciplinary action, demotion again was not mentioned. *Id*. Only the 30-day suspension was described. *Id*. Furthermore, the NFAA gives the same factual narrative, word-for-word, as the NPAA. *Id*. On February 22, 2007, Plaintiff was "reassigned" or demoted to the position of Police Officer from his position of Senior Patrol Officer. Dunovant Depo., Ex. 1, at P-11-1-1. The demotion was to be effective March 6, 2007. *Id*. Plaintiff suffered a cut in pay when he was demoted from Senior Patrol Officer to Patrol Officer. Docket Entry [61-2], at ¶47. Plaintiff was also suspended for 30 days without pay. *Id*.

Generally, Plaintiff argues that Defendants agreed to punish him for testifying on behalf of a criminal defendant in violation of § 1985. Plaintiff further argues that his demotion and suspension were acts of retaliation for his testimony on Grissom's behalf, and those retaliatory acts violate Plaintiff's First Amendment rights. The court notes that Plaintiff does not ask the court to decide the constitutionality of either Work Rule 4.1.12 or Work Rule 4.3.03,[6] and as such, the court will make no determination as to whether the Work Rules are constitutional. Defendants contend that Plaintiff was demoted and suspended for a failure to notify anyone in his chain of command immediately (or ever) after

---

[6]Plaintiff does discuss the constitutionality of Work Rule 4.3.03 in its response to Defendants' motion for summary judgment. Docket Entry [63]. However, he only does so in response to Defendants' discussion of the constitutionality of Rule 4.3.03. Plaintiff states that he does not believe that the court needs to determine the constitutionality of that Rule. Neither party discusses the constitutionality of Work Rule 4.1.12.

AO 72A
(Rev.8/82)

Plaintiff testified on Grissom's behalf, not because of the actual act of testifying for a criminal defendant. Therefore, Defendants argue that there was no retaliation. Plaintiff counters that Defendants' alleged reliance on Rule 4.3.03 as the reason for his punishment is merely pretext, and he was actually punished because he testified on behalf of Grissom. Plaintiff argues that this is evidenced by the fact that he was charged under and investigated for a violation of Rule 4.1.12, all Defendants recommended punishment based on that rule, and the Rule suspiciously changed to 4.3.03 months after the investigation started, but the length and type of punishment remained the same.

The individual Defendants were sued in both their individual and official capacities. Defendants argue that the individual Defendants, in their individual capacities, have qualified immunity from Plaintiff's suit. Defendants also contend that the City, and the Defendants in their official capacities, are immune from this suit because Plaintiff has not shown that the City of Atlanta had a practice or policy of violating any constitutional rights.[7] Even if Defendants are not protected under those theories, Defendants allege that Plaintiff's speech was not constitutionally protected nor was there any conspiracy.

### B.      Discussion

#### 1.      First Amendment and § 1983 Claims

---

[7] Defendants do not actually address their arguments towards the Defendants in their individual or official capacities. However, suits against city officials in their official capacities are considered to be suits against the City itself. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978).

### a.    Individual Defendants

It is well-established that a public employee may not be punished in retaliation for exercising his First Amendment rights to free speech. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). However, the right to be free from retaliation is not unconditional. *Walker v. Schwalbe*, 112 F.3d 1127, 1131 (11th Cir. 1997). Instead, a public employee is only protected from retaliation where he can show that his speech was protected, and that the speech played a substantial role in an adverse employment action taken against him. *Id*. If the employee makes such a showing, the burden then shifts to the state to show that it would have taken the same action against the employee even if the employee had never engaged in the protected speech. *Bryson v. City of Waycross*, 888 F.3d 1562, 1566 (11th Cir. 1989). Even if Plaintiff can establish a genuine issue of material fact as to his First Amendment claim, the doctrine of qualified immunity may still protect Defendants from liability. *Walker*, 112 F.3d at 1132. Therefore, the court finds it prudent to address the issue of qualified immunity first.

AO 72A
(Rev.8/82)

The Eleventh Circuit recently stated:

> Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law. . . .

*McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal citations and quotations omitted). In determining if Defendants can assert qualified immunity, the court must consider whether Defendants' actions were discretionary in nature, whether Plaintiff established a constitutional violation on behalf of Defendants, and/or whether the law surrounding Plaintiff's First Amendment right was clearly established at the time it was allegedly violated. *Id.*

Ascertaining whether Defendants acted within their discretionary authority requires the court to decide (1) whether Defendants were performing a legitimate job-related function or pursuing a job-related goal and (2) whether that performance was within the scope of his authority. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). According to the record, each Defendant engaged in reviewing Plaintiff's disciplinary file and recommending and/or carrying out discipline for alleged violations of department Work Rules. Plaintiff's disciplinary file and testimony given by Defendants indicate that it is standard procedure for those in an investigated employee's chain of command to review the

15

employee's file, recommend discipline, and then send the file and recommendation up the chain of command. As superiors in Plaintiff's chain of command, Defendants' actions were clearly job-related and seem to be within the scope of their authority, and Plaintiff does not argue otherwise. Therefore, Defendants have satisfied their burden of showing that they were engaged in discretionary functions.

The burden now shifts to Plaintiff to show that his constitutional rights have indeed been violated and that the law establishing such violation was clear at the time of Defendants' actions. Exercising the discretion given to it in *Pearson v. Callahan*, the court will first address the existence of a constitutional violation. 129 S. Ct. 808 (2009). First Amendment retaliation claims brought by government employees are analyzed under a four-part test: "(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." *Walker*, 112 F.3d at 1131. The court must determine whether the speech was protected as matter of law, while the determination of whether the protected speech caused the adverse employment action is a matter of fact. *Beckwith v. City of Daytona*, 58 F.2d 1554, 1564 (11th Cir. 1995).

AO 72A
(Rev.8/82)

To be protected by the First Amendment, an employee's speech must be on a matter of public concern. Speech is a matter of public concern where it is related to matters of public interest, and where it is made "primarily in the employee's role as a citizen" rather than an employee. *Morris v. Crow*, 142 F.3d 1379, 1382 (11th Cir. 1998). This determination is made by looking at the "content, form, and context of a given statement, as revealed by the whole record." *Id*. The speech at issue in the present case is Plaintiff's testimony as a character witness on behalf of Michael Grissom.[8] First, Plaintiff claims that his speech was clearly given in his capacity as a private citizen. He was off duty, not in uniform, and testified at Grissom's hearing that he knew Grissom "essentially as a family member." Docket Entry [45-4]. Plaintiff further argues that any testimony given in a judicial proceeding, as a private citizen, is a matter of public concern. Plaintiff also reasons that his speech was of public concern because it was not intended to benefit him personally in any way.

Defendants, on the other hand, contend that Plaintiff testified in his capacity as a Senior Patrol Officer with the City of Atlanta rather than as a private citizen. Defendants base this argument on the fact that at the time Plaintiff testified he was employed by the City

---

[8] Defendants, at several points in their brief, seem to assume or argue that the relevant speech is Reid's failure to notify his chain of command. However, Reid is arguing that his punishment for failure to notify his chain of command was actually pretext for punishment for testifying on behalf of Grissom. Therefore, the protected speech is Plaintiff's testimony at Grissom's bond hearing.

of Atlanta, he testified on direct examination that he was a police officer, and he testified on cross-examination that he worked as a Senior Patrol Officer for the City of Atlanta Police Department. Defendants argue that it is also pertinent that Plaintiff "did not inform the court or the prosecution that he was speaking as a private citizen, [and Plaintiff] did not inform the court or the prosecution that he was not speaking in an official capacity as a Senior Patrol Officer with the City of Atlanta Police Department." Docket Entry [45-1], at 27. Even if Plaintiff was speaking as a private citizen, Defendants contend that there are "no Eleventh Circuit case[s] that hold[] that a voluntary appearance and testimony at a bond hearing is a matter of public concern." *Id.* at 23.

It is clear to the court that Plaintiff's testimony on behalf of Grissom was made in his capacity as a private citizen. Plaintiff was at Grissom's hearing when he was off duty for the purpose of supporting his girlfriend. He was not in uniform, and he did not inform the court that he was there in his professional capacity as an employee of the Atlanta Police Department. Plaintiff merely mentioned his occupation and his employer when directly asked questions pertaining to his employment on both direct and cross-examination. Furthermore, Plaintiff testified that he knew Grissom basically as a family member, and not in any context that involved his occupation as a police officer. Plaintiff cannot be considered to have testified in his official capacity solely because he is employed as a public employee and testified to such employment. Furthermore, Plaintiff's failure to specifically tell the

18

court or prosecutor that he was testifying in his personal capacity and not on behalf of the Atlanta Police Department does not axiomatically transform the character of his testimony. This is especially so in light of the fact that Plaintiff was off duty and dressed in plain clothes at the time of the hearing, and the content of his testimony spoke to his familial-like relationship with Grissom.

Now that the court has determined that Plaintiff testified in his personal capacity, the court turns to the nature of the testimony, looking to the content, form, and context of the speech. In applying the "'content, form, and context' analysis, a court may consider the content of the speech, the employee's motivation in speaking, the forum of the speech, and the employee's efforts to communicate his concerns to the public." *Henry v. City of Tallahassee*, 149 F. Supp. 2d 1324, 1328 (N.D. Fla. 2001) (citing *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir. 1991)). In the qualified immunity analysis, the court must view the facts in the light most favorable to Plaintiff. Plaintiff's speech was made on behalf of a relative of his girlfriend in order to provide beneficial character testimony, and the parties have offered no other motivation. The testimony was given at a bond hearing, in a federal court, open to the public, where a transcript of the hearing was placed on the public record. The purpose of a bond hearing is to determine whether a criminal defendant should be either held in federal custody or released into society to await trial. That is certainly of interest to the community, and any testimony to that regard, whether it be on behalf of the defendant

AO 72A
(Rev.8/82)

or the prosecution, is a matter that concerns the public. The court does not hold that any and all testimony in federal proceedings is a matter of public concern, only the testimony involved in the present case.

The court now continues to the second element of Plaintiff's First Amendment retaliation claim, weighing Plaintiff's interest in testifying for Grissom against the interests of the government, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The *Pickering* balancing test recognizes that governments should be allowed "wide latitude in managing their offices." *Connick v. Myers*, 461 U.S. 138, 146 (1983). In essence, government employers may take action against employees who engage in speech that "may unreasonably disrupt the efficient conduct of government operations." *Tindal v. Montgomery County Com'n*, 32 F.3d 1535, 1540 (11th Cir. 1994). Furthermore, the Eleventh Circuit has recognized that paramilitary or quasi-military organizations like police departments have more specialized concerns than a normal government office. *See, e.g., Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994). *See also Connick v. Myers*, 461 U.S. at 151-52 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."); *Kelley v. Johnson*, 425 U.S. 238, 246 (1976) (remarking that there is a "need for discipline, esprit de corps, and

uniformity" in police departments); Rogers v. Miller, 57 F.3d 986, 992 (11th Cir. 1995);

*Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991).

Defendants argue that the APD's interests in preventing speech such as Plaintiff's outweigh any interest Plaintiff may have in testifying for a criminal defendant. According to Defendants:

> These interests include the interdiction of drugs, fighting criminals who rob banks, protecting the safety of officers and other members of the public community, fostering trust and confidence among police officers in the City of Atlanta and the officers and agents of other law enforcement agencies including the FBI, and protecting the integrity and reputation of the Atlanta Police Department.

Docket Entry [61-1], at 27. Defendants further allege that Plaintiff's actions were potentially disruptive of the APD's functioning because Plaintiff's failure to notify someone in his chain of command of his testimony in Grissom's case broke an APD rule.[9] Defendants also find it "especially significant" that Plaintiff testified on behalf of a criminal defendant who had previously been convicted of armed robbery twice and was presently being charged with having committed a third armed robbery. This, to Defendants, could have discredited the APD, endangered law enforcement officers, and tarnished APD's public image. Furthermore, this might have been perceived as a breach of trust and security, which could

---

[9] The court again notes that the issue here is not whether Plaintiff did or did not violate Work Rule 4.3.03. The issue is whether Defendants, under the guise of applying Work Rule 4.3.03, actually punished Plaintiff solely on the basis of his testimony on behalf of a criminal defendant.

jeopardize ongoing investigations. In return, Plaintiff argues that Eleventh Circuit law requires Defendants show that disruption of the APD's operation or workplace efficiency actually occurred or was likely to occur, and Defendants have offered no such evidence. Furthermore, Plaintiff argues that testimony in federal court proceedings inherently concerns a matter of public concern and is protected by the Constitution. Additionally, where the testimony is not intended to improve the witness' own situation, the speech merits protection.

While the act of testimony alone does not "absolutely shield the public employee from further scrutiny by his superiors," the court recognizes that Plaintiff, as a citizen, does have a strong interest in testifying truthfully at judicial proceedings. It is in the public interest to encourage truthful and forthright testimony, even where that testimony is voluntary,[10] and the Supreme Court has recognized that every citizen has a "basic obligation" to testify in court because it is "necessary to the administration of justice." *United States v. Calandra*, 414 U.S. 338, 345 (1974). While voluntarily given testimony may implicate less of a public interest than subpoenaed testimony, testimony at a criminal bond hearing, as stated above, still strongly implicates public concern and public interest — especially in this case, where the criminal defendant was charged with armed robbery in

---

[10] The Tenth Circuit has "concluded that a witness' sworn testimony in a court proceeding is entitled to heightened protection under the First Amendment." *Lytle v. City of Haysville, Kansas*, 138 F.3d 857, 864 n. 2 (10th Cir. 1998).

possession of a firearm. Further, Plaintiff also had a personal interest in testifying on behalf of a close friend or pseudo-family member who needed a character witness to help him convince a judge that he should be allowed out on bond while awaiting a trial for pending criminal charges.

These interests must now be weighed against the "admittedly strong interests of [Defendants] in maintaining close working relationships, mutual respect, discipline, and trust in the quasi-military setting of the police department." *Stanley v. City of Dalton, Georgia*, 219 F.3d 1280, 1289 (11th Cir. 2000). As the Eleventh Circuit pointed out in *Stanley*, "there is no bright-line standard," and the Eleventh Circuit has "reached divergent outcomes in . . . police department cases because of the presence or lack of a particular factor." 219 F.3d at 1289. In *Stanley*, the plaintiff was a police officer in the Dalton Police Department. *Id.* at 1282. In 1993, the Georgia Bureau of Investigation interviewed Stanley because it suspected that money in the evidence room had been stolen. *Id.* Stanley was interviewed in front of the Chief of the Dalton Police Department and two other officers. *Id.* Stanley testified that he suspected the Deputy Chief, Chadwick, because Chadwick was one of two people who had a key, and the theft seemed to have been done by an insider. *Id.* The Deputy Chief was interested in becoming Chief, and Stanley told the GBI that he thought Chadwick staged the theft to make the current chief look bad. *Id.* According to Stanley, he never shared his theory with anyone outside of the GBI interview. *Id.* After the Stanley interview,

23

Chadwick was interviewed by the GBI as well. *Id*. at 1283. Upon learning what Stanley accused him of, Chadwick informed Stanley that he did not appreciate Stanley's accusations. *Id*. The GBI never determined who was responsible for stealing the money from the evidence room. *Id*.

That same year, Chadwick was promoted to Acting Chief and, not too long after, "announced his intention to transfer Stanley from the Narcotics Unit to the third shift in the Uniform Patrol Division." *Id*. at 1283. Chadwick asked other officers who were being transferred to different duties for their preferences, but Chadwick did not ask Stanley. *Id*. The transfer did not decrease either Stanley's salary or lower his rank, although he did lose his uniform allowance and use of a department car. *Id*. Stanley also alleged that he was passed over for a promotion after the GBI interview, and Chadwick failed to follow departmental procedure in posting the position for which Stanley was passed over. *Id*. There are several other incidences, which Stanley alleged were in retaliation for the statements he made in the GBI interview, ultimately ending with Stanley being terminated for allegedly unprofessional conduct and other miscellaneous reasons. *Id*. at 1284-85.

After determining that Stanley's speech to the GBI was a matter of public concern, the court broached the *Pickering* issue. *Id.* at 1289. The Eleventh Circuit recognized the strong interest police departments, as paramilitary organizations, have in promoting departmental efficiency and trust and preventing disruptions, especially regarding

accusations against a superior officer. *Id*. The court further recognized that Stanley could have handled the GBI investigation better. *Id*. at 1290. He could have merely told the GBI that Chadwick had one of the two keys to the evidence room without actually imparting his theory that Chadwick staged the theft. *Id*. However, Stanley did not voice his theory to anyone but the GBI, and there was no evidence that Stanley's accusations actually caused any disruption. *Id*. at 1290-91. The Eleventh Circuit determined that because there was no evidence of actual disruption, this tilted the *Pickering* balance in Stanley's favor. *Id*. at 1291.

The Eleventh Circuit differentiated the situation in *Stanley* from *Bryson v. City of Waycross*. *Stanley*, 219 F.3d at 1290. In *Bryson*, the plaintiff was a police captain with the Waycross, Georgia police department, and he had been for twenty-three years. 888 F.2d at 1564. Bryson filed a complaint with the city of Waycross "alleging that Police Chief W. Lynn Taylor had stolen whiskey from the police department evidence room in 1980." *Id*. The complaint was investigated and determined to be unfounded. *Id*. After the investigation, Bryson was reassigned to duties that did not decrease his salary, but he did lose the privilege of using a police vehicle. *Id*. Bryson also took it upon himself to investigate Chief Taylor by questioning other police officers and recording those conversations. *Id*. After being reassigned, Bryson sued the city and several others, alleging violations of his right to free speech pursuant to § 1983. *Id*.

The Eleventh Circuit compared the importance of encouraging speech that helps expose government corruption, with the disruption Bryson's speech actually caused. *Bryson*, *Id.* at 1566-67. While recognizing the importance of whistle-blowing type speech, the balance was swayed by the fact that Bryson made complaints about the chief to "all who would listen," and he openly investigated the chief, which "severely undermined the morale of the police department." *Id*. at 1567. In fact, some of the other officers actually avoided the police station in an attempt to avoid Bryson. *Id*. The court reasoned that "Bryson's speech would have been found protected had he confined his complaint to the proper time, place, and manner." *Id*. The Eleventh Circuit affirmed the district court's ruling that the *Pickering* balance favored the defendants. *Id*.

Unlike the case in *Bryson* and more like *Stanley*, there seems to have been no disruption of the work place or police department operations in the present case. While Defendants argue in their brief that such disruption could have ensued, their argument is couched in terms of generalities about what *might* have happened or what *could* happen when a police officer testifies on behalf of a criminal defendant. While the court understands Defendants' argument, no disruption actually occurred.[11] The United States Supreme Court

---

[11] Defendants have not provided the court with any evidence of disruption. Furthermore, Defendant Dreher testified that he was unaware of any disruption, and he was unaware of any substantial likelihood that there would be disruption based on Plaintiff's actions. Dreher Depo., at 58:14-15. Lieutenant Hendricks also testified at his deposition that there were no disruptions. Hendricks Depo., at 84-86.

AO 72A
(Rev.8/82)

has concluded that courts should consider as pertinent whether the employee's speech "impairs discipline by superiors or harmony among coworkers," whether the speech has a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary," and finally, whether the speech "impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388 (citing *Pickering*, 391 U.S. at 570-73). None of that seems to have occurred here. The *Pickering* balance ultimately tilts in Plaintiff's favor.

The next step in the qualified immunity analysis is to determine whether the facts, when viewed in the light most favorable to Plaintiff, establish that Plaintiff's speech was a substantial or motivating factor in his demotion. Plaintiff has presented evidence that he was originally investigated by the City of Atlanta Police Department's Internal Affairs Unit based on the APD's Work Rule 4.1.12, which disallows employees to engage in certain transactions with defendants or suspects. The transaction listed in Plaintiff's disciplinary file was his testimony in federal court on behalf of Grissom. When Plaintiff was questioned by Investigator Haff of the APD Internal Affairs Unit, all questioning surrounded his actual testimony on Grissom's behalf. There was only one question asked regarding if he gave notice to anyone in his chain of command, and the question only pertained to prior notice — not notice generally.

Pursuant to the investigation into the possible violation of Rule 4.1.12, each of the individual Defendants recommended demotion and some also recommended a suspension of some length.[12] Defendant Pennington, the final decision-maker in the process, recommended that Plaintiff be demoted and suspended for thirty days due to a sustained violation of Rule 4.1.12. This occurred on November 14, 2006. According to Chief Pennington, normally a notice would have been sent to Plaintiff a few weeks after the final concurrence by the Chief. However, in January of 2007, a new sheet was added to Plaintiff's disciplinary file in which the recommended discipline was the same,[13] but the Work Rule violated was now 4.3.03, which deals with notice of involvement in a court action. The new worksheet seems to have been promulgated by the APD legal department, who decided that Rule 4.3.03 was "more appropriate" than Rule 4.1.12. Pennington Depo., at 52:8-10.

---

[12] In a memo from Defendant Dunovant to Defendant Dreher, Deputy Chief Dunovant indicates that he thinks a 30-day suspension and demotion is appropriate because Plaintiff testified for Grissom, and that testimony brought discredit upon the department. Defendant Dreher, in deposition testimony, stated that he based his November recommendation for demotion and suspension of Plaintiff solely due to Plaintiff's testimony on behalf of Grissom. Dreher Depo., at 35:8-12. Chief Pennington also testified during a deposition that he based his November recommendation for 30-day suspension and demotion on Plaintiff's violation of rule 4.1.12, which has nothing to do with notification. Pennington Depo., at 52-53.

[13] The recommended discipline listed on the January 2007 worksheet is actually only a thirty-day suspension. It says nothing about demotion. However, Plaintiff was in fact suspended for thirty days and demoted, which is the same punishment that was recommended under the earlier employee discipline worksheet.

After the new worksheet was put in Plaintiff's file, a Notice of Proposed Adverse Action was given to Plaintiff. While the NPAA indicated that Plaintiff was being charged with a violation of 4.3.03, the notice rule, the narrative giving the reasons behind the charge do not mention any failure to give notice by Plaintiff. Instead, the narrative focuses only on the fact that Plaintiff testified for Grissom, Grissom was charged with counts of bank robbery and use of a fire arm during the commission of a felony, and that Grissom had been convicted twice before for armed robbery. When recommending discipline, the reviewing officers in Plaintiff's chain of command based their recommendation, at least in part, on those documents contained in the disciplinary file. Plaintiff's disciplinary file regarding this incident generally does not address his failure to give notice. Instead, the focus of the file is on his association with Grissom and his testimony on behalf of Grissom.

The plaintiff's burden in showing that a jury question exists as to whether the protected speech was a substantial factor in the adverse employment action taken against him is not a heavy one. *Stanley*, 219 F.3d at 1291. No single standard has been fashioned for determining whether Plaintiff has met his burden, *id*., and the court has examined the record as a whole. When the facts are viewed in the light most favorable to Plaintiff, a reasonable jury could find that Defendants' proffered reasons are a pretext for the real motive behind Plaintiff's punishment. Based upon Plaintiff's disciplinary file and the deposition testimony of Defendants and other involved parties, a jury could decide that

Plaintiff was in fact fired because he gave testimony on behalf of a criminal defendant, and not because he failed to give notice in compliance with Rule 4.3.03.

The court must next determine whether the law was clearly established when Defendants' actions occurred in 2007.

> [Q]ualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Public officials can still have notice that their conduct is unlawful even if previous cases are not "fundamentally similar" or do not have "materially similar" facts. *Id*. at 741. Plaintiff argues that it was clearly established, at the time of Defendants' conduct, that said conduct violated Plaintiff's right to testify. Defendants argue that this is a novel fact situation, and Plaintiff has not provided the court with a case nor does such a case exist that would have given Defendants fair warning that their actions were unconstitutional.

The Eleventh Circuit noted in *Holloman ex rel. Holloman v. Harland* that *Hope* "seems to have abrogated many of the . . . standards articulated in" prior Eleventh Circuit law. 370 F.3d 1252, 1278 (11th Cir. 2004). Post-*Hope*, in *Vinyard v. Wilson*, the Eleventh Circuit stated the following method for determining whether a law was clearly established:

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified

30

immunity, even in the *total absence of case law*. . . . For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

311 F.3d 1340, 1350 (11th Cir. 2002) (emphasis in original). Plaintiff's claim is based on a violation of the First Amendment pursuant to § 1983, and it is clear to the court that neither the language of the First Amendment nor § 1983 is so clear nor Defendants' conduct so egregious, that case law is not needed to establish that the conduct cannot be lawful.

The Eleventh Circuit in *Vinyard* next stated that "if the conduct is not so egregious as to violate . . . the [First] Amendment on its face, we then *turn* to case law. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351 (emphasis in original). Here, the applicable principle or statement of law is that a public employer may not retaliate against a public employee for speech that is protected by the First Amendment. The Eleventh Circuit has recognized post-*Hope* that "where the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting case law that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 954 (11th Cir. 2003). The *Pickering* balancing test, which requires comparison of the plaintiff's interest in the speech with the defendant's interest in preventing the speech,

qualifies as a highly general legal standard, which depends on the circumstances of the case. *See Connick*, 461 U.S. at 150 (holding that *Pickering* requires a particularized balancing that "varies depending upon the nature of the employee's expression" and that "such particularized balancing is difficult."). As such, this case is not one in which broad statements of principle in case law can clearly establish the law applicable to future cases containing different sets of particularized facts. *See Vinyard*, 311 F.3d at 1351. *See also Davis v. Phenix City, Alabama*, No. 3:06cv544-WHA, 2008 WL 401349, at *6 (M.D. Ala. Feb. 12, 2008); *Dixon v. Bd. of Regents of the Univ. Sys. of Georgia*, No. 1:06-CV-1696-TWT, 2007 WL 3476926, at *4 (N.D. Ga. Nov. 1, 2007) (Thrash, J.) ("After *Hope*, courts have been hesitant to hold that the case-by-case First Amendment retaliation analysis applies with obvious clarity to a defendant's conduct.").

Lastly, the court looks to "precedent *that is tied to the facts*," as required by *Vinyard*. 311 F.3d at 1351 (emphasis in original). According to the Eleventh Circuit, the court can only look to case law from the United States Supreme Court and the United States Court of Appeals for the Eleventh Circuit when "case law is needed to 'clearly establish' the law applicable to the pertinent circumstances." *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1033 n.10 (11th Cir. 2001). Plaintiff has not offered the court any case law from the United States Supreme Court or the Eleventh Circuit discussing First Amendment retaliation claims with facts that are similar or instructive. Keeping in mind that the APD is a

32

paramilitary organization, which has stronger interests than others in preventing disruptive speech, the court itself can find no relevant case in which a defendant was found to have violated the First Amendment by retaliating against a police officer who testified in a judicial proceeding. In the only remotely factually similar cases the court can find, the plaintiffs in those cases lost. *See Stanley*, 219 F.3d 1280; *Green v. Barret*, 226 Fed. Appx. 883 (11th Cir. 2007). Plaintiff has not sustained his burden in showing that Defendants do not deserve qualified immunity. *See, e.g., Willingham v. Loughnan*, 321 F.3d 1299, 1304 (11th Cir. 2003); *Stanley*, 219 F.3d at 1297. Defendants could not have had fair warning that their conduct violated the Constitution.

Defendants have qualified immunity against Plaintiff's claims, and Plaintiff cannot recover on his § 1983 claims against them in their individual capacities. Plaintiff's motion for summary judgment is DENIED as to its First Amendment retaliation claims against Defendants Pennington, Dreher, Dunovant, and Hagan, in their individual capacities, and Defendant's motion for summary judgment is GRANTED on the same.

### b.      City of Atlanta

Municipalities may be held liable under § 1983, however, they cannot be held liable on the basis of *respondeat superior*.[14] *Monell*, 36 U.S. at 690-93. A "local government may

---

[14]Plaintiff sued the individual Defendants in their official capacities as well as in their individual capacities. Suits against government officers in their official capacities are essentially suits against the City of Atlanta, and any determinations with regard to the liability of the City also apply to Defendants in their official capacities. *Monell*, 436 U.S.

AO 72A
(Rev.8/82)

only be held liable under Section 1983 if action pursuant to official . . . policy of some nature caused a constitutional tort. Further, only municipal officers or groups who have final policymaking authority may subject the municipality to § 1983 liability." *Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1312 (11th Cir. 2006). *See also Dixon v. Burke County, Georgia*, 303 F.3d 1271, 1276 (11th Cir. 2002). A municipality may additionally be held liable under § 1983 for "acts which the municipality officially sanctioned or ordered . . . ." *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637 (11th Cir. 1991). In order to receive summary judgment on his § 1983 claims against the City of Atlanta, the burden is on Plaintiff to show that "a deprivation of constitutional rights occurred as a result of an official government policy or custom." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005). The parties have done little briefing on the subject of municipal liability and, therefore, the court address the issue in light of its review of the record. Plaintiff simply argues that Defendants' actions were taken pursuant to APD Work Rule 4.1.12 and 4.3.03, which were adopted by the Police Department, on approval of the Chief of Police. Because this is an official policy of the City, the City may be held liable under Section 1983. Defendants respond that Plaintiff has not clearly illuminated the policy or custom under which the City is to be held liable and, therefore, Plaintiff's claims against the City of Atlanta must be dismissed.

---

at 690 n. 55.

Here, Plaintiff makes no allegation that the acts by the individual Defendants were "officially sanctioned or ordered" by the City of Atlanta. *Manor*, 929 F.2d at 637. Furthermore, Plaintiff has not asked us to decide the constitutionality of either APD Work Rule discussed in this case. Instead, Plaintiff focuses on the actions taken by Defendants, allegedly under the guise of applying the Work Rules. However, Plaintiff also does not allege that any Defendant possessed final policy-making authority, and likely could not argue such. First, the record does not show and Plaintiff does not argue that Defendants Dreher, Dunovant, and Hagin have anything to do with making or applying the Work Rules. Docket Entry [61-2], at ¶ 4. They simply make suggestions that the Chief can either heed or ignore. *Id.* Further, Chief Pennington does not create the Work Rules. As far as the court can tell, the City of Atlanta's legal department creates and interprets the Work Rules, and the Chief has the authority to implement decisions regarding them. Pennington Depo., at 18. However, it appears that after the Chief makes a decision, that decision can be reviewed. In his deposition, Chief Pennington refers to a Major Davis who was terminated for violating a Work Rule, but later reinstated after she appealed her termination to "Civil Service."[15] Pennington Depo., at 53, 69-70. The testimony is unclear as to how exactly the process works, but it indicates that employment decisions made by Chief Pennington are reviewable, and "[f]inal policymaking authority over a particular subject area does not vest in an official

---

[15] This likely refers to the City of Atlanta Civil Services Board.

whose decisions in the area are subject to meaningful administrative review." *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003).

Either way, Plaintiff has not argued that the City sanctioned or ordered Defendants' actions, Plaintiff has not requested the court to address the constitutionality of the Work Rules, only Defendants' actions, and Plaintiff has not argued that Defendants' actions were taken pursuant to their final policy-making authority. All the court can gather from the record is that the City Attorney for the City of Atlanta creates and interprets the Work Rules, and Chief Pennington decides whether to adopt them and when to enforce them, but there may be some sort of appeals process for employees to take their grievances in front of "Civil Services." This is not enough to hold the City of Atlanta liable under § 1983 for Defendants' actions, which resulted in Plaintiff's demotion and suspension, and, therefore, Plaintiff has not fulfilled his burden of establishing that liability. Plaintiff's motion for summary judgment as to his § 1983 claims against the City of Atlanta and Defendants in their official capacities is DENIED [57], while Defendants' motion for summary judgment regarding the same is GRANTED [45] and [47].

AO 72A
(Rev.8/82)

### 2.     Retaliation under § 1985

#### a.     Individual Defendants

Plaintiff also brought claims against Defendants Pennington, Dreher, Dunovant, and Hagin in their individual capacities for violations of §1985(2). Section 1985(2) has two clauses, and Plaintiff's claim falls under the first which makes it unlawful for "two or more persons in any State or Territory [to] conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court . . . or to injure such party or witness in his person or property on account of his having so attended or testified . . . ." Unlike other parts of § 1985, this clause does not require that Plaintiff show any racial, or otherwise class-based, discriminatory animus behind Defendants' actions. *Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983). Instead, Plaintiff must show (1) the existence of a conspiracy, (2) retaliation spawned by the attendance or testimony in federal court, (3) an act in furtherance of the conspiracy, and (4) injury to Plaintiff. *Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009) (Martin, J.). A conspiracy is an "agreement between parties to inflict a wrong against or injury upon another . . . ." *Id.* at 1346 (quotations and citations omitted). Conspiracy may be proven by circumstantial evidence, and in fact, "the existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement." *United States v. Morales,* 868 F.2d 1562, 1574 (11th Cir. 1989). Furthermore, the Supreme Court

37

has explained that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of the other." *Salinas v. United States,* 522 U.S. 52, 63 (1997).

Plaintiff argues that he has provided sufficient evidence showing that there was an agreement between the individual Defendants to punish him for testifying in federal court. The evidence relied upon by Plaintiff to establish a conspiracy includes the undisputed fact that each Defendant recommended some form of punishment on Plaintiff's Employee Discipline Worksheet, and each Defendant originally recommended that punishment based upon an alleged violation of Work Rule 4.1.12. Plaintiff allegedly violated Rule 4.1.12 by testifying on Grissom's behalf in federal court. Therefore, Plaintiff argues that Defendants agreed, evidenced by their recommendations found in Plaintiff's disciplinary file, that Plaintiff should be punished for the testimony he provided on Mr. Grissom's behalf. Defendants' response[16] is that Defendants did not have an agreement because some of them recommended different punishment, Plaintiff was punished for failure to give notice (not for testifying), and that Plaintiff has not provided sufficient evidence to support a conspiracy.

---

[16] Defendants also seem to argue that because Defendant Myers was dismissed from the case, Plaintiff no longer has a conspiracy claim. The court does not understand how dismissal of Defendant Myers affects Plaintiff's argument that the remaining Defendants conspired with one another to retaliate against him for his testimony in federal court.

AO 72A
(Rev.8/82)

Defendant Hagin recommended that Plaintiff be demoted and receive a 10-day suspension based on a sustained violation of Rule 4.1.12. Dunovant Depo., Ex. 1, at P-1-1. Defendant Dunovant had to either concur with Hagin's recommendation or recommend new punishment, and he ultimately recommended that Plaintiff be demoted and receive a 30-day suspension for a sustained violation of Rule 4.1.12. *Id.* Defendant Dreher, who also had to either concur with Dunovant's recommendation or recommend new punishment, agreed with Dunovant's recommendation for suspension and demotion. *Id.* at P-1-1-1. Defendants Dreher and Pennington also agreed with the previous recommendation of suspension for thirty days and demotion. *Id.* Those original recommendations were based upon Rule 4.1.12, which prohibits transactions with certain people. Therefore, at some point in time, the facts show that Defendants agreed that Plaintiff should be punished for violating Rule 4.1.12 by testifying on behalf of a criminal defendant.

Plaintiff was ultimately punished, according to Defendants, for a violation of Rule 4.3.03, which requires him to give certain notice if involved in a court action. The disciplinary file and record both contain evidence that Plaintiff was punished under Rule 4.3.03. After February of 2007, the documentation in Plaintiff's disciplinary file refers to Rule 4.3.03. It is undisputed that Plaintiff did not tell anyone other than Sergeant Earls that he testified for Grissom. Furthermore, the Chief states that he discussed the issue of notice with Plaintiff at Plaintiff's disciplinary hearing. Pennington Depo., at 54-55. The Chief's

testimony further expresses that he made his final decision based on Plaintiff's failure to give notice. Pennington Depo., at 84:21-24. Defendant Dreher also testified that he concurred with the Chief's decision to punish Plaintiff based upon Rule 4.3.03. Dreher Depo., at 66:4-10.

However, Plaintiff has put forth evidence suggesting that Rule 4.3.03 was used as pretext for Defendants' real motivations. For example, for months, the investigation into Plaintiff involved an alleged violation of Rule 4.1.12, and Rule 4.3.03 was not really mentioned until months after the investigation started. Facts regarding Plaintiff's giving of or failure to give notice is noticeably absent from his disciplinary file. Furthermore, while there is some evidence that Plaintiff did not properly notify someone in his chain of command, as required by the Work Rule, there is also evidence that Plaintiff did notify a superior about his testimony. Overall, the court finds that there is a genuine dispute regarding what Plaintiff was actually punished for and, therefore, the question of whether Defendants agreed or conspired to violate Plaintiff's constitutional rights must be decided by a jury.

As to the remaining elements of Plaintiff's conspiracy claim, injury and overt acts, Plaintiff alleges that Defendants acted overtly in carrying out their conspiracy when they put down their recommendations in writing, which ultimately resulted in his being suspended or demoted. Defendants do not argue otherwise. These would constitute overt acts, if

Defendants did indeed agree to punish Plaintiff because of his testimony. Furthermore, Defendants' actions resulted in Plaintiff being demoted and suspended, and there is no dispute that Plaintiff's demotion and suspension caused him financial injury. While Plaintiff has produced evidence of the remaining elements of his § 1985 claim, summary judgment cannot be granted to either party because the court cannot determine Defendants' actual motivation for punishing Plaintiff based upon the current record.

Even if there is a genuine dispute over a material issue of fact, Defendants still argue that they should be granted summary judgment based either on the intracorporate conspiracy doctrine or qualified immunity. The court first addresses the intracorporate conspiracy doctrine, a doctrine that originated in antitrust law and "holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). *McAndrew* established that an exception exists to application of the intracorporate conspiracy doctrine in § 1985 cases, and the exception occurs where a plaintiff's §1985(2) claim also necessarily involves allegations of a criminal conspiracy. *Id.* at 1039.

Plaintiff's complaint alleges that Defendants' actions violate 18 U.S.C. §§ 241, 1503, and 1512. "18 U.S.C. § 241 is the criminal counterpart to [42 U.S.C.] § 1985, . . . [and] a claim brought under . . . § 1985, which alleges conduct that qualifies as a crime under 18

U.S.C. § 241, suffices to exempt the claimed conspiracy from the intracorporate conspiracy doctrine." *Aque*, 629 F. Supp. 2d at 1344. 18 U.S.C. § 241 criminalizes conduct in which "two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, **or because of his having so exercised the same**." The right to testify in federal court is such a right. *Aque*, 629 F. Supp. 2d 1336. Defendants argue that Plaintiff's allegations of criminal conspiracy are unsupported by the record, and in light of such, Defendants are entitled to intracorporate immunity. However, as stated above, Plaintiff has introduced evidence that Defendants agreed to punish Plaintiff because of his testimony in federal court and Plaintiff was eventually demoted and suspended, which financially injured Plaintiff. Therefore, Plaintiff's allegations that Defendants' actions violate 18 U.S.C. § 241 are not unsupported. Defendants make no other argument regarding why they are entitled to have the intracorporate conspiracy doctrine applied to them and, therefore, Defendants are not saved by the intracorporate conspiracy doctrine.

Finally, Defendants argue that they are entitled to qualified immunity because their actions did not violate clearly established law. In *Burnell v. Bd. of Trs. of Georgia Military Coll.*, the Eleventh Circuit held that a qualified immunity defense is not available to defendants in cases where the plaintiff is asserting a claim under § 1985(3). 970 F.2d 785,

42

793-94 (11th Cir. 1992). This decision was based on the fact that § 1985(3) requires a plaintiff to show a "class-based, invidiously discriminatory purpose behind the defendants' action," and this "narrow intent requirement erects a significant hurdle for section 1985(3) plaintiffs." *Id*. at 794. Because this provides public officials with extra insulation from § 1985(3) claims that is not available under § 1983 claims, the inability to assert qualified immunity does not "threaten the breathing space [public officials] need for making discretionary decisions." *Id*. In other words, because plaintiffs must show some kind of race or class based discrimination, any actions by public officials in those situations "deserve to be chilled with the full force of federal law." *Id*.

The Eleventh Circuit has not addressed whether qualified immunity applies under § 1985(2). Other courts in this circuit have held that qualified immunity is not available to defendants when the plaintiff alleges a violation of the **second** clause of § 1985(2) because that clause also requires that the plaintiff show some sort of class-based, discriminatory purpose behind the defendant's actions. *Shahawy v. Lee*, No. 95-269-CIV-T-21-B, 1996 WL 33663633, at *18 (M.D. Fla. Dec. 13, 1996). However, Plaintiff bases his claim in the present case on the **first** clause of § 1985(2), which does not require him to show class-based discrimination. Therefore, the "additional safeguard" discussed by the *Burrell* court is not present. As such, the court finds that Defendants may assert a qualified immunity defense in the present action. This does not, however, end the query. The court must still

43

determine whether Defendants are entitled to summary judgment on their qualified immunity defense.

As stated previously, to determine whether Defendants are entitled to qualified immunity the court must consider whether Defendants' actions were discretionary in nature, whether Plaintiff established a constitutional violation on behalf of Defendants, and/or whether the law surrounding Plaintiff's right under § 1985 was clearly established at the time it was allegedly violated. *McCullough*, 559 F.3d at 1205 (11th Cir. 2009). The court already determined that Defendants' actions were discretionary in nature. Exercising the discernment granted to it by the Supreme Court in *Pearson*, the court first discusses whether Defendants violated clearly established law. The court recalls its previous discussion of the Eleventh Circuit decision in *Vinyard*:

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*. . . . Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. . . . Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent[17] *that is tied to the facts.*

---

[17] This precedent refers only to United States Supreme Court decisions, Eleventh Circuit decisions, and relevant state supreme court decisions. *Marsh*, 268 F.3d at 1033 n.10.

44

311 F.3d at 1350-52. Section 1985(2) makes it unlawful for two or more people to "injure [any] party or witness [in any court of the United States] in his person or property on account of his having so attended [such court] or testified." This language is unambiguous, and the Supreme Court has noted that § 1985 is to be "accord(ed) [] a sweep as broad as [its] language." *Griffin v. Breckenridge,* 403 U.S. 88, 97 (1971). Furthermore, several Supreme Court cases and Eleventh Circuit cases make the purpose of this statutory language clear. *See Haddle v. Garrison*, 525 U.S. 121, 125 (1998) ("The gist of the wrong at which § 1985(2) is directed is . . . intimidation or retaliation against witnesses in federal-court proceedings."); *Farese v. Scherer*, 342 F.3d 1223, 1229 -30 (11th Cir. 2003) ("Section 1985(2) prohibits conspiracies to intimidate parties or witnesses to federal lawsuits, [and] . . . the gist of the wrong at which § 1985(2) is directed is . . . intimidation or retaliation against witnesses in federal court proceedings."); *Chavis v. Clayton County School Dist.*, 300 F.3d 1288, 1293 (11th Cir. 2002) ("[The] first clause of section 1985(2) specifically prohibits injuring a witness on account of his testifying in federal court . . . ."); *O'Neal v. Garrison*, 263 F.3d 1317, 1321-22 (11th Cir. 2001) (citing Supreme Court precedent for the proposition that "the gist of the wrong at which § 1985(2) is directed is . . . intimidation or retaliation against witnesses in federal court proceedings"); *Kimble v. D. J. McDuffy,*

45

*Inc.*, 648 F.2d 340, 350 (5th Cir. 1981) (holding that the first clause of § 1985(2) is, in part, "aimed at retaliations for past federal court attendance or testimony.").[18]

Under Eleventh Circuit and Supreme Court precedent, "the salient question is whether the state of the law at the time provided officials fair warning that their discriminatory retaliatory conduct was unlawful." *Bryant v. Jones*, 575 F.3d 1281, 1309 (11th Cir. 2009). The court concludes that the text of § 1985(2) and relevant case law discussing that clause gave Defendants fair warning that they could not retaliate against Plaintiff for exercising his right to testify in federal court. Unlike the *Pickering* issue in a First Amendment retaliation claim brought pursuant to § 1983, there is no highly general applicable legal standard. Section 1985(2) clearly prohibits conspiracies to injure someone in retaliation for testifying as a witness in federal court and, therefore, qualified immunity is not available to Defendants.

Neither qualified immunity nor the intracorporate conspiracy doctrine require that Defendants be granted summary judgment on Plaintiff's § 1985 claims. Furthermore, there is a genuine issue of material fact regarding why Plaintiff was punished. Therefore, Plaintiff's motion for summary judgment as to his §1985 claims against Defendants in their individual capacities is DENIED [57]. Defendants' motions for summary judgment as to

---

[18] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Plaintiff's § 1985 claims against them in their individual capacities is also DENIED [45] and [47].

To be clear, at trial Plaintiff will be required to prove that Defendants conspired to retaliate against him on the basis of his testimony in federal court on behalf of Michael Grissom and that the retaliation injured him. The court notes that in Title VII and § 1983 lawsuits, "an employer can avoid liability if it can prove that it would have made the same disputed employment decision in the absence of the alleged bias." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001). Neither party discussed the mixed-motives defense in the context of Plaintiff's § 1985(2) retaliation claim, and while the court declines to discuss it now, the parties should be prepared to submit pretrial briefs regarding the issue.

### b.     City of Atlanta

The same standard that applies in § 1983 actions regarding municipal liability and the liability of city officials when sued in their official capacities also applies in § 1985 actions. *See Swint v. City of Wadley, Ala.,* 5 F.3d 1435, 1451 (11th Cir. 1993), *rev'd on other grounds sub nom. Swint v. Chambers County Comm'n,* 514 U.S. 35 (1995). *See also Thomas v. Roach*, 165 F.3d 137, 147 (2d. Cir. 1999)*; Moye v. City of Raleigh*, 503 F.2d 631, 635 n. 10 (4th Cir. 1974); *Griffin v. City of Brunswick, Georgia*, No. CV204-146, 2005 WL 3272461, at *2 (S.D. Ga. Nov. 30, 2005) (Alaimo, J.). Plaintiff and Defendants' arguments regarding municipal liability for Plaintiff's § 1985 claims are the same as those for

Plaintiff's § 1983 claim. For those reasons previously discussed, Plaintiff has not satisfied his burden of showing that the City of Atlanta should be held liable for the actions of the individual defendants. Therefore, Plaintiff's motion for summary judgment is DENIED as to his § 1985 claim against the City of Atlanta and the individual Defendants in their official capacities [57]. Defendants' motions for summary judgment is GRANTED as to Plaintiff's § 1985 claims against the City of Atlanta and the individual Defendants in their official capacities [45] and [47].

## II. Motion for Judgment [67]

Plaintiff included Defendant Myers in his § 1983 and § 1985 claims. Plaintiff also sued only Defendant Myers for the state law claim of tortious interference in employment. The court granted summary judgment to Defendant Myers and the United States of America. Defendant Myers and the United States of America moved for summary judgment. The court granted that motion as to all federal claims against Defendant Myers and declined to exercise jurisdiction over the remaining state law tortious interference with employment claim. Defendant Myers and the United States have now requested that this court enter final judgment in their favor pursuant to Federal Rule of Civil Procedure 54(b). The motion is unopposed.

Fed R. Civ. P. 54(b) states that "When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final

judgment as to one or more, but fewer than all, claims or parties . . . if the court expressly determines that there is no just reason for delay." "District courts have substantial discretion in determining when there is no just cause for delay in entering judgment under Rule 54(b)." *Intergraph Corp. v. Intel Corp.,* 253 F.3d 695, 699 (Fed. Cir. 2001) (citing *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 351 U.S. 445, 452 (1956)). In order to grant Defendant Myers and the United States' motion, the court must find (1) that multiple claims or parties are fully resolved, (2) that there is no just cause for delay, and (3) that the judgment constitutes a final judgment. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427 (1956).

The court dismissed all claims against Defendant Myers and the United States, and, therefore, multiple claims and/or parties are fully resolved. The order granting summary judgment to Defendant Myers and the United States on all federal claims and dismissing the remaining state claim against Defendant Myers was final in nature. Furthermore, Plaintiff's claims against the City of Atlanta and the remaining individual Defendants do not require that Defendant Myers be kept in the litigation. As no claims against Defendant Myers or the United States remain before this court, and this has been the case since February of 2009, there appears to be no just cause for delay. Defendant Myers and the United States of America's motion is GRANTED [67].

AO 72A
(Rev.8/82)

## III.    Conclusion

Defendants' motion for leave to file excess pages [44] and Plaintiff's motion for leave to file excess pages [62] are GRANTED. Plaintiff's motion for summary judgment is DENIED [57]. Defendants' motions for summary judgment are GRANTED in part and DENIED in part [45] and [47]. Defendants' motion for summary judgment as to Plaintiff's § 1983 claims against all Defendants is GRANTED. Defendants' motion for summary judgment as to Plaintiff's § 1985 claims is GRANTED as to the City of Atlanta, but DENIED as to Defendants Pennington, Dreher, Dunovant, and Hagin in their individual capacities. Therefore, the only remaining claims are Plaintiff's § 1985 claims against Defendants Pennington, Dreher, Dunovant, and Hagin in their individual capacities. The parties are directed to file a pretrial order within thirty (30) days of the date of this order. Defendant Myers and the United States of America's motion for final judgment  is GRANTED [67], and the Clerk of the Court is DIRECTED to enter  final judgment in favor of Defendant Myers and the United States of America pursuant to Fed. R. Civ. P. 54(b)  as to Plaintiff's § 1985 and § 1983 claims only.

**IT IS SO ORDERED** this 22nd  day of March 2010.


_____/s   J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)